IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| SHARON A. SCHREIBER, | ) | |
| | ) | Case No.: 10 C 50167 |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of Social Security. | ) | |
| | ) | |
| Defendant, | ) | |

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

Sharon A. Schreiber seeks judicial review of the Social Security Administration

Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the magistrate

judge pursuant to the consent of both parties, filed on July 8, 2010.  *See* 28 U.S.C. § 636(c); Fed.

R. Civ. P. 73.

### II.     Administrative Proceedings

Claimant first filed for SSI and DIB on September 13, 2006.  (Tr. 112, 115.)  She alleges

a disability onset date of December 2, 2005.  (Tr. 112, 115.)  Her claim was denied initially and

on reconsideration.  (Tr. 49, 57.)  The Administrative Law Judge ("ALJ") conducted hearings

into Claimant's application for benefits on May 15, 2008. (Tr. 21.)  At the hearing, Claimant was

represented by counsel and testified.  (Tr. 21-46.)  Ms. Keer, a Vocational Expert (hereinafter

referred to as "VE") was also present and testified. (Tr. 21-46.) The ALJ issued a written

decision denying Claimant's application on September 3, 2008, finding that Claimant was able to

perform past relevant work as an assembler and machine operator. (Tr. 19-20.) Because the

Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that

decision constitutes the final decision of the Commissioner. (Tr. 3.)

**III.    Hearing**

Claimant testified to the following at her hearing with the ALJ:

She was 43 years old, married, and lived with her husband and son. (Tr. 26.) She

completed high school and took a few college courses, but has no other formal vocational

training. (Tr. 27.) She served in the U.S. Navy for one year and was honorably discharged for a

medical reason. (Tr. 27.)

Claimant last worked in December 2005 when she tried to run her own business. (Tr.

27.) She was in charge of nearly everything at the business, including opening the store, doing

all of the work, cleaning everything, and closing down the store around 11 at night. (Tr. 28.)

She had "breakdown" shortly after opening the store and could not work. (Tr. 28.) She

attempted to work again after going on medications, but was unable to do so and had to sell the

business in June 2006. (Tr. 28.)

Claimant takes Effexor, Lamictal, Geodon, Xanax, and naproxen sodium for her

symptoms. (Tr. 29.) The medications help her to feel better but do not give her everything she

needs to fix her problems. (Tr. 29.) The side effects she experiences include blurred vision,

heart palpiltations, weakness, grogginess, headaches, and weight gain. (Tr. 29-30, 39-40.)

A typical day involves waking her son up around seven in the morning and getting him

2

ready for school.  (Tr. 30.)  On most days, Claimant drives him to school and is home by 8:30 A.M., at which point she will sometimes lay back down until around noon.  (Tr. 30-31.)  On days where she feels okay, she will sit on the couch or go visit her mom until early afternoon.  (Tr. 31.)  She sometimes goes online to chat with others who have her condition and waits for her son to come home.  (Tr. 31.)  She tries to help her son with homework, and waits for her husband to come home.  (Tr. 32.)  On good days, she will try to get the kitchen ready so her husband can cook when he gets home.  (Tr. 32.)  In the evenings, she tries to sit and spend time with her family.  (Tr. 32.)

Claimant is able to dress and groom herself.  (Tr. 32.)  She does some grocery shopping, but her husband usually does it.  (Tr. 33.)  She does a minimal amount of household chores, and will work in the yard about once a week.  (Tr. 33.)  She sees friends about once every two weeks, and has a friend who she talks to on the phone every day.  (Tr. 36.)

She experiences panic and anxiety that make it difficult for her to be around people.  (Tr. 34.)  Her problems getting along with people are caused by mood swings, getting irritated easily, and a few verbal conflicts with others.  (Tr. 37.)  Claimant believes her biggest problem is with concentration and losing focus.  (Tr. 37-38.)  In general, she believes she is only capable of being productive for about two good hours in a day.  (Tr. 41.)

Claimant has panic attacks anywhere from zero to three times per day, and believes she experiences an average of about two per day.  (Tr. 34, 38.)  When she has an attack, her heart pounds and she gets very shaky and confused.  (Tr. 34.)  Each attack can last for up to a few hours.  (Tr. 34.)  She takes Xanax to get the panic attacks under control but it makes her very tired.  (Tr. 38.)  At times she is able to regain control almost immediately, and other times it can

3

take up to a day or two.  (Tr. 38.)  The prolonged attacks happen two or three times per month.

(Tr. 39.)  After taking the Xanax, Claimant's fatigue and headache make it so she is not capable

of anything for the remainder of the day.  (Tr. 40.)

She was treated by a physician, Dr. Belford, since 1995.  (Tr. 35.)  She used to see him

once every three months, but now goes in once every two months.  (Tr. 35.)  She was in daily

group counseling for a few weeks in 2007 while she was seeing a therapist.  (Tr. 35-36.)  The

visits to the therapists were on-and-off for about six months on a weekly basis, but Claimant did

not find them helpful and they were discontinued.  (Tr. 36.)

The VE described Claimant's past work as a general office clerk as light but having been

performed at the sedentary level, low in the semiskilled range, and non-transferrable in terms of

skills.  (Tr. 43.)  Claimant's past assembly work was categorized as light and unskilled, and her

machine operator work was considered medium and unskilled.  (Tr. 43.)  The VE testified that a

person of the claimant's age, education, and work history who was limited to simple tasks in a

setting with limited social or interpersonal demands and with no more than simple changes in the

work setting could do Ms. Schreiber's past relevant work as an assembler or machine operator.

(Tr. 43.)  If the Claimant were found to be credible in her description of all of her impairments,

the VE stated that she could not sustain full-time employment because her panic attacks would

take her off task for 10 to 15 percent of the workday.  (Tr. 44.)  The VE explained that a worker

needs to sustain pace and productivity 85 percent of the time in an non-manufacturing context

and 90 percent of the time in simple manufacturing jobs.  (Tr. 45.)


**IV.    Medical Evidence**

4

The earliest note in Claimant's medical record appears to be from an appointment in January 2005 with her physician, Dr. Mary E. Belford, M.D. (Tr. 313.) Dr. Belford described the appointment as a fifteen minute medical check, and noted that Claimant's health had been fine. (Tr. 313.) She was tolerating her medication without trouble. (Tr. 313.) Her irritability was reported as minimal, her moods more stable, her anxiety under control, her sleep and appetite fine, her affect bright, and her work was going fine. (Tr. 313.) Claimant was reportedly volunteering at a friend's horse stable in order to be able to ride the horses more often. (Tr. 313.) A follow-up medication check on May 2, 2005 revealed similar findings. (Tr. 314.)

On December 19, 2005, Claimant called Dr. Belford's office to report that she was a mess after recently attempting to start her own business, a combination of a coffee shop and video rental store. (Tr. 211, 315.) Claimant had been feeling so well prior to starting the business that she had weaned herself off of Paxil and started taking St. John's Wort, and believed she could successfully start and run the business. (Tr. 211.) She reported that her business ran well for four days, but then she closed it because she was not able to handle the anxiety of running it. (Tr. 315.) She stated that she could not stop crying, that her daughter moved out to stay with Claimant's mom, that she had a poor appetite, poor sleep, mood swings, low confidence, and low self esteem. (Tr. 315.) Claimant was advised to take her proper medication dosage, get enough sleep, and look for help with her business. (Tr. 315.) Claimant had a follow-up appointment on January 19, 2006 with similar reported symptoms. (Tr. 202.) Claimant stated that the store she had opened remained closed, that they had many bills because of the store, and that she believed she made a mess of things. (Tr. 202.) Dr. Belford's findings were that Claimant was well groomed with good hygiene, but showed impaired judgment; demonstrated

5

no understanding of her present illness; demonstrated no understanding of her need for treatment; appeared agitated and anxious; cried during the exam; had increased problems making decisions; had a moderately depressed affect; and had no suicidal plan. (Tr. 202.) A subsequent appointment on January 26, 2006 revealed similar reported symptoms and findings. (Tr. 204.)

Claimant reported feeling better at an appointment on February 8, 2006. (Tr. 205.) She said she began to feel better within days of starting to take Zyprexa for her symptoms. She reported that she was sleeping better, eating better, had stopped losing weight, stopped experiencing diarrhea, and was able to concentrate better. (Tr. 205.) Claimant reportedly had worked through some problems with the business and allowed a neighbor to take it over. (Tr. 205.) Her husband and family remained supportive. (Tr. 205.) Dr. Belford advised that it would take a few weeks for Claimant's prescribed medication of Effexor to kick in, and at that point she could wean down on Zyprexa. (Tr. 205.) Claimant reported continued improvement of nearly all of her symptoms at a February 20, 2006 appointment. (Tr. 207.)

On April 5, 2006, Claimant reported to Dr. Belford that she felt she was sinking back to her old symptoms. (Tr. 209.) Notes indicate that Claimant's appetite had decreased, that she was crying excessively, and that she had feelings of hopelessness and sadness, though she was still sleeping better. (Tr. 209.) Claimant was prescribed Paxil to replace Abilify, and continued on her prescription for Zyprexa. (Tr. 209.)

On April 21, 2006, Claimant was hospitalized after reporting that she woke up every morning disappointed that she was not dead. (Tr. 211-12.) Notes on her history of present illness indicate a history of tremendous anxiety and depression, which were controlled for several years through Paxil. (Tr. 211.) Claimant felt well enough to wean off the Paxil and on to

6

St. John's Wort. (Tr. 211.) After attempting to start her business, she went back on Paxil and felt that it was not working. (Tr. 211.) Claimant reported that she was tremulous, anxious, irritable, and could not concentrate. (Tr. 211.) She had lost a total of 35 pounds due to a loss of appetite. (Tr. 212.) Claimant's husband reported that she wanted to sleep all the time. (Tr. 212.) During her stay, she never admitted to an active plan to harm herself, but Claimant showed passive suicidal ideations and had many crying spells. (Tr. 215-16.) Claimant felt that she had started her business during a hypomanic episode where she took on more than she could handle. (Tr. 216.) Claimant was assessed as having bipolar disorder and an Axis V current level of functioning score of 20.[1] (Tr. 236.) On discharge, Claimant was denying any intention of harming herself or anyone else; had no hallucinations; was sleeping and eating better; was crying less; and had stabilized on her medication. (Tr. 249.) Her discharge diagnosis included bipolar disorder and panic disorder, though no GAF score was listed. (Tr. 249-50.)

On May 15, 2006, Claimant was admitted to Riverside Medical Center after complaining that she had thoughts of suicide. (Tr. 229.) Claimant repeated many of her prior symptoms, though she indicated that she recently had become upset and "went after her daughters" before realizing she needed more help. (Tr. 229.) She was diagnosed with major depressive disorder,

---

[1] Axis V is measured using the Global Assessment of Functioning ("GAF") scale. The GAF score is a measure from 1 to 100, with a score of 100 representing superior functioning. *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000) (hereinafter "*DSM-IV-TR*"). The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health illness[,]" and does not "include impairment in functioning due to physical (or environmental) limitations." *Id.*
A GAF score of 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement)" or a failure to maintain personal hygiene or gross impairment in communication. *Id.* at p. 34.
The court notes that this GAF score was characterized as a present level of functioning, and is not necessarily indicative of Claimant's general functional state.

7

recurrent, and found to have a GAF score of 45.[2]  (Tr. 231.)  Because Claimant had recently

readjusted to new medications, including Depakote, she was encouraged to continue with the

medications she was on and to attend group therapy.  (Tr. 231.)

Claimant continued to see Dr. Belford in a series of visits through May, June, and July of

2006.  (Tr. 218-23.)  She was often tearful during the visits, but denied suicidal thoughts.  (218-

23.)  She reported persistent feelings of sadness, hopelessness, and loneliness, and felt she was

getting worse again.  (Tr. 220.)  Claimant did not believe that her medications were working

very well, and stated that Klonopin was making her too drowsy.  (Tr. 220.)  Claimant had been

attending psychotherapy, but stopped when she believed her insurance ran out for the year.  (Tr.

222.)  She was informed that her insurance would cover counseling, and pledged to begin

attending sessions again.  (Tr. 222.)  Claimant was switched from Depakote, which she believed

was not working, to Tegretol.  (Tr. 222.)  Notes from a September 25, 2006 appointment show

that Claimant stated that she was miserable and continued to feel stressed about the financial

situation her family was in.  (Tr. 224.)  She was again advised to pursue counseling, and stated

that she would actually start going.  (Tr. 224.)  On November 7, 2006, Claimant reported that she

was doing somewhat better, but basically felt numb and did not want to do anything.  (Tr. 300.)

She explained that she wanted to go back to counseling but her insurance would not allow it

again until the next January.  (Tr. 300.)

Claimant was examined by Dr. Erwin J. Baukus, Ph.D. on November 16, 2006 at the

request of the state agency.  (Tr. 274-48.)  Claimant reported symptoms of depression and

---

[2]A GAF score of 45 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at p. 34.

generalized persistent anxiety. (Tr. 275-76.) Claimant's affect was variable with moderate amplitude. (Tr. 277.) She was easily moved to tears and her mood was depressed. (Tr. 277.) Claimant reported being able to take care of her own personal hygiene and that she took care of her children, though she often let chores around the house go. (Tr. 276.) Dr. Baukus diagnosed Claimant with bipolar disorder, current episode depressed, with anxiety. (Tr. 278.)

On November 24, 2006, Dr. Russell Taylor, Ph.D., performed a psychiatric review technique and filled out a mental residual functional capacity ("RFC") form for the state agency. (Tr. 279-95.) Dr. Taylor opined that Claimant had bipolar disorder with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. (Tr. 282.) Dr. Taylor found that Claimant's bipolar disorder caused mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace and one or two episodes of decompensation, each of extended duration. (Tr. 289.) On the mental RFC, Dr. Taylor found Claimant was moderately limited in the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (Tr. 293-94.) Dr. Taylor reviewed Claimant's treatment records from Dr. Belford and the notes from Dr. Baukus. (Tr. 295.) He concluded that Claimant was capable of

understanding, remembering, and carrying out simple tasks on a sustained basis; would require a work setting with limited social/interpersonal demands secondary to anxiety and episodic irritability; and would be able to adjust to simple changes in the work setting. (Tr. 295.) Dr. Taylor's opinions were affirmed by Dr. Ronald Havens, Ph.D. at the request of the state agency on February 26, 2007. (Tr. 305.)

Claimant returned to see Dr. Belford on January 10, 2007. (Tr. 302.) Dr. Belford noted that many of Claimant's symptoms had improved or remained stable, though she was "definitely not back to her usual self." (Tr. 302.) Her concentration and memory were still very poor. (Tr. 302.) Dr. Belford adjusted Claimant's Geodon prescription, a mood stabilizer, in order to try to get her back to feeling normal. (Tr. 302.) On March 7, 2007, Claimant reported to Dr. Belford that she was finally feeling more like herself and showed improvement in nearly every symptom. (Tr. 369.) Dr. Belford noted that Claimant "seems to be a little hypomanic." (Tr. 369.) Claimant was sleeping better, able to focus, felt good, and agreed to keep an eye on whether euphoric symptoms surfaced. (Tr. 369.) She was continuing to engage in counseling. (Tr. 369.) Claimant again reported feeling better at a follow-up appointment on May 16, 2007. (Tr. 371.) Dr. Belford indicated Claimant "still has some of the roller coaster left," but that she was generally doing better. (Tr. 371.) Claimant was looking to get back on track with her counseling, was looking to make more healthy lifestyle choices, and had resumed gardening and reading. (Tr. 371.)

Dr. Belford filled out a Statement of Ability to do Work-Related Activities form on June 4, 2007. (Tr. 308-09.) Dr. Belford's opinions were based on a clinical interview with Claimant. (Tr. 308.) Dr. Belford found that Claimant's ability to understand, remember, and carry out

10

instructions was affected by her impairment. (Tr. 308.) She opined that Claimant had a poor ability to perform the following work-related activities: understand and remember detailed instructions; carry out detailed instructions; maintain concentration for extended periods; work with others without being disturbed by them; complete a normal workday or workweek; and perform at a persistent pace. (Tr. 308.) Claimant's ability to respond appropriately to supervisors, co-workers, and work pressures were found to be poor in the following areas: ability to accept instructions and respond appropriately to criticism from supervisors; ability to respond appropriately to changes in the work setting; ability to travel to unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. (Tr. 309.) Claimant was found to have a fair ability to perform all other tasks listed. (Tr. 308-09.)

On August 29, 2007, Claimant returned to see Dr. Belford and was generally doing much better as compared to a year prior. (Tr. 373.) She was eating better, sleeping better, and generally felt fine during the day except for anxiety that triggered "once in awhile." (Tr. 373.) Claimant described some anxiety about being able to afford a vacation she had planned, but was going to go anyway. (Tr. 373.) At a November 2007 follow-up appointment Claimant reported similar symptoms. (Tr. 375.) She described general improvement but still being on an emotional rollercoaster. (Tr. 374.) Claimant said that winter was a more difficult time for her and that she had not left her house in weeks. (Tr. 374.) Her husband was doing all of the shopping at that point. (Tr. 374.) She had not followed-up with a counselor, and was reluctant to changing her medication even though she knew she had to wean off of Effexor. (Tr. 375-76.) She agreed to start a small dose of Provigil. (Tr. 376.)

At a February 27, 2008 follow-up appointment, Dr. Belford found that Claimant was

doing "pretty well." (Tr. 377.) Claimant denied persistent feelings of sadness, fatigue, loss of

interest in normal activities, racing thoughts, and unusual life stressors. (Tr. 377.) Claimant's

sleep, irritability, mood, energy level, and motivation were all reportedly improved. (Tr. 377.)

Claimant's anxiety was described as being under control. (Tr. 377.) She was not experiencing

any side effects of her medications so they were left unchanged. (Tr. 377.) This is the last

appointment noted in Claimant's medical record.

## V.     Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal

conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).

However, the court "may not decide the facts anew, reweigh the evidence or substitute its own

judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts,

make independent findings of fact, and decide the case are entrusted to the Commissioner.

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows

reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for

that decision falls on the Commissioner."). The court may remand to the Commissioner where

there is a showing that there is new evidence which is material and that there is good cause for

the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. §

405(g).

If the Commissioner's decision is supported by substantial evidence, and the ALJ has not

committed reversible error, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see*

*also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence

which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at

782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from

that evidence to the conclusion, the ALJ's findings are supported by substantial evidence.

*Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks

evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be

remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI. Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that

results from anatomical, physiological, or psychological abnormalities which are demonstrable

by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a

claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the

following: (1) whether the claimant is currently engaged in substantial gainful activity; (2)

whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is

medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4)

whether the claimant is capable of performing work which the claimant performed in the past;

and (5) whether any other work exists in significant numbers in the national economy which

accommodates the claimant's residual functional capacity and vocational factors. The court will

analyze each of these factors to determine whether the Commissioner's decision was supported

13

by substantial evidence.

**VII.    Analysis**

    **A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit.  20 C.F.R. § 404.1510.  If the claimant is engaged in substantial gainful activity, she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Claimant has not engaged in substantial gainful activity since the alleged onset date.  (Tr. 15.)  Neither party disputes this determination.  As such, the ALJ's Step One determination is affirmed.

    **B.    Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment.  A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education, and work experience are not considered in making a Step Two severity determination.  20 C.F.R. § 404.1520(c).  If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: bipolar disorder, anxiety, and depression.  (Tr. 15.)  The

14

substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

**C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, appx. 1. (Tr. 15-16.) The ALJ found that claimant's affective and anxiety-related disorders do not meet or medically equal the criteria of listings 12.04 (Affective Disorders) or 12.06 (Anxiety Disorders). (Tr. 15-16.) In order to find the required level of severity under Listing 12.04 and/or 12.06, either the requirements in subparts A and B, or the requirements in subpart C must be satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.00. Paragraph B sets out four criteria to be used in assessing severity, and a Claimant is said to meet the requirements of the paragraph if two of the four criteria are satisfied.

15

*Id.* Referring to the "paragraph B" criteria, the ALJ found that Claimant experiences mild restriction in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation. (Tr. 16.) The ALJ also considered the "paragraph C" criteria, and specifically noted that it was not satisfied by Claimant's condition. (Tr. 16.) The ALJ's finding, supported by substantial evidence in the record, clearly explains why Claimant's symptoms do not meet the requirements in Listings 12.04 or 12.06. Therefore, the ALJ's determination was appropriate as to Claimant's depression and neither party challenges this finding.

The court affirms the ALJ's Step Three determination.

**D.** **Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations. *Id*. Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

16

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows her to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ found that the Claimant had the residual functional capacity to perform work at all exertional levels, but that she must be limited to simple tasks in a setting with limited social or interpersonal demands and no more than simple changes in the work setting. (Tr. 16.) In making his RFC determination, the ALJ indicated that he considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (Tr. 16.) The ALJ also considered opinion evidence in accordance with the requirements of 20

CFR 404.1529 and 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 16.) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 16.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements concerning intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the assessed RFC. (Tr. 17.)

Based on his RFC finding, the ALJ found that Claimant was capable of performing her past relevant work as an assembler and machine operator. (Tr. 19.) Claimant argues that the ALJ committed reversible error by improperly rejecting the opinions of Claimant's treating physician and failing to make an appropriate credibility finding. Ultimately, Claimant believes the ALJ arrived at an unsupported RFC finding. (Pl. Mem., Dkt. No. 18, pp. 4-15.)

Claimant is correct that the ALJ found Dr. Belford's Medical Source Statement of Ability to do Work-Related Activities from June 4, 2007 unpersuasive. (Tr. 18.) In the ALJ's view, the Statement was conclusory, inconsistent with other significant evidence of record, and described no clinical findings to support the significant limitations listed by Dr. Belford. (Tr. 18-19.) As described, *supra*, the statement opined that Claimant had a poor ability to perform a number of work-related tasks, and a fair ability to do others. Claimant believes the ALJ's errors in analyzing Dr. Belford's opinions were two-fold: (1) the ALJ erroneously stated that the most

18

recent treatment note was from January 2007 and failed to discuss subsequent treatment notes; and (2) the ALJ overlooked the chronic nature of bipolar disorder, which leads to good and bad days.

An ALJ must give controlling weight to the medical opinion of a treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." SSR 96-2p; *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). The ALJ identified notes from Dr. Belford that were inconsistent with the opinions in her Statement of Ability to do Work-Related Activities, including notations about Claimant's improved symptoms, or complete lack of symptoms at some appointments. (Tr. 19.) The ALJ explained that other contradictory evidence included Claimants own description of her activities of daily living and her conservative levels of treatment. (Tr. 19.) Specifically, the ALJ indicated that Claimant saw Dr. Belford every two months for fifteen minutes at a time, and did not consistently attend therapy. (Tr. 19.) Opinions from non-examining consultants may also be considered as "other substantial evidence" that is inconsistent with a treating source opinion. *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ found Dr. Belford's opinions to be inconsistent with those of Dr. Taylor and Dr. Havens. The court finds the ALJ identified substantial evidence that was inconsistent with Dr. Belford's opinions on the Statement of Ability to do Work-Related Activities form.

The second question, then, is the amount of weight Dr. Belford's opinion should be given as compared to the other substantial evidence in the record. When an ALJ does not give controlling weight to the opinion of a treating physician, he should apply the following factors to determine how much weight to give the opinion: (1) the length of the treatment relationship and

19

the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the

supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5)

the specialization of the treater; and (5) any other factors which tend to support or contradict the

opinion. 20 C.F.R. § 404.1527(d). As noted above, the ALJ discussed the nature, extent, and

frequency of Claimant's treatment, explaining that she visited Dr. Belford infrequently and for

short periods of time. The ALJ also found Dr. Belford's conclusions to be inconsistent with the

balance of the medical record and the opinions of the state agency reviewing doctors.

Notwithstanding the analysis by the ALJ regarding the weight afforded to Dr. Belford's

conclusions from the Statement of Ability to do Work-Related Activities form, it is not clear that

the ALJ completely rejected all opinions and findings from Dr. Belford. The ALJ limited

Claimant's RFC to work that required simple tasks with limited social or interpersonal demands

and no more than simple changes in work setting. These limitations appear to incorporate Dr.

Belford's opinions and treatment decisions to some degree.

The court also finds the ALJ's error in failing to address Claimant's appointments with

Dr. Belford after the January 2007 visit to be harmless. The appointments in March, May,

August, and November of 2007 and in February of 2008 all contain notes of improvement with

Claimant's symptoms. Claimant reported "feeling more like herself," "doing much better," and

having her anxiety "under control." The only negative treatment notes out of the five

appointments after January 2007 related to Claimant's anxiety about how to pay for a vacation,

and some emotional difficulties triggered by the onset of winter. The balance of the medical

record indicates that Claimant was improving and had no side effects from her medication.

Thus, the ALJ's statement that the record contained no treatment notes since January 2007 that

20

would establish any significant worsening of Claimant's condition is supported by substantial evidence in the record.

The court is not persuaded as to Claimant's argument that the ALJ failed to give appropriate consideration to the nature of bipolar disorder. Claimant is correct that bipolar disorder is unique in that it is likely to produce good and bad days. In *Bauer*, the Seventh Circuit explained that a claimant with bipolar disorder may be well enough to work half the time, but an inability to work for the other half of the time would prevent such a person from holding competitive employment. *Bauer*, 532 F.3d at 609. Therefore, an ALJ must do more than rely on "hopeful remarks" from the claimant or the ALJ. *Id.* In the *Bauer* case, the claimant had a number of positive reports about her symptoms, but was also hospitalized on a number of occasions with hallucinations, racing thoughts, thoughts of suicide, and other symptoms. *Id.* at 607. Both of the claimant's treating physicians opined that she could not hold down a full-time job. *Id.* The Seventh Circuit held that the ALJ should have given consideration to more than the positive remarks in the claimant's medical record. *Id.* at 609.

Bipolar disorder varies in severity, and can be treated with antipsychotic medications. *Id.* at 607. Claimant's symptoms in this case are distinguishable from those of the claimant in the *Bauer* case. The ALJ noted that Claimant experienced one episode of decompensation beginning in December 2005 when she tried to open her own business. (Tr. 17.) The episode culminated in her hospitalization in April 2006. (Tr. 17.) Through Claimant's GAF score was listed as a 20 on admission to the hospital, and estimated to be 45 several weeks later, the court finds these GAF scores to provide snapshots of Claimant's condition during an episode of decompensation. (Tr. 17.) The ALJ correctly states that there were no subsequent

21

hospitalizations, and Claimant's own statements tend to describe consistent improvement after her hospitalization. (Tr. 17.) There was no evidence of any additional episode of decompensation or hospitalization after April 2006, and no subsequent GAF scores are found outside Claimant's single episode of decompensation. (Tr. 18.) Therefore, the court finds the ALJ did not commit error by focusing only on hopeful or positive remarks. Instead, the ALJ appears to have relied on a broad array of evidence over Claimant's entire medical record.

The court does not find reversible error in the ALJ's credibility finding. The ALJ pointed to specific evidence from the medical record that contradicted Claimant's statements at her hearing. For example, the ALJ contrasted Claimant's statements about significant alleged side effects from her medications with the reports to her treating physician that she experienced no medical side effects. (Tr. 17-18.) The ALJ also indicated that the Claimant testified to her own improvement both at her hearing and repeatedly to Dr. Belford, which contradicts her testimony about her work-related limitations. (Tr. 17-18.)

Having found that the ALJ did not commit reversible error, the court will examine whether the ALJ's conclusion is supported by substantial evidence in the medical record. Though much of the evidence is described in the discussions from preceding paragraphs, the following is a summary of evidence the ALJ relied on in support of his RFC finding:

- Claimant rarely reported any side effects from her medications to Dr. Belford;

- Treatment notes from Dr. Belford described improvement in Claimant's symptoms with treatment;

- Treatment notes from January 7, 2007 noted improvement in Claimant's anxiety, appetite, and crying spells; and the Claimant denied anhedonia, suicidal ideation, fatigue, feelings of hopelessness and worthlessness, and persistent feelings of sadness and loss of interest in normal activities;

22

- Claimant testified that she could perform a wide variety of activities of daily living, including taking care of her own hygiene, performing household chores, caring for her son, visiting with her mother, chatting on the internet, helping her son with homework, and watching television with her family;

- Claimant was not hospitalized after her April 2006 episode of decompensation;

- Two state agency reviewing psychologists opined that Claimant retained the capability to work with limitations consistent with the ALJ's ultimate RFC finding; and

- Claimant received relatively infrequent treatment from Dr. Belford, having only visited once every two months for approximately 15 minutes and did not consistently attend therapy sessions.

Based on the foregoing, the court finds substantial evidence supports the ALJ's RFC finding. The ALJ synthesized the evidence from Claimant's testimony and treatment notes with the opinions of the state agency reviewing physicians. The ALJ also assessed Claimant's credibility in light of the substantial evidence in the record, finding the evidence did not support Claimant's testimony regarding the severity of her symptoms and limitations. The ALJ referred to the same evidence when evaluating how much weight should be given to Dr. Belford's opinions. In light of the above, the court finds the ALJ built a logical bridge from the substantial evidence in the medical record to her RFC finding.

The ALJ relied on the opinion of the VE, who found Claimant to be capable of performing her past relevant work as an assembler and machine operator. Because the ALJ's RFC determination is supported by substantial evidence in the record and the VE based her opinion on the RFC, the court finds that the ALJ appropriately relied on the VE's testimony in arriving at his decision that Claimant could perform past relevant work.

For the foregoing reasons, the ALJ's Step Four finding is affirmed.

## VIII.   Conclusion

For the forgoing reasons, the Commissioner's motion for summary judgment is granted, and Claimant's motion for summary judgment is denied.


E N T E R:

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT**


**DATE**: May 23, 2012

24